STATE of Maine

v.

Richard D. KIMBALL.

STATE of Maine

v.

Randolph R. LORD.

Supreme Judicial Court of Maine.

Argued Sept. 15, 1980.

Decided Jan. 7, 1981.

Charles K. Leadbetter, Michael E. Saucier (orally), Herbert Bunker, Jr., Asst. Attys. Gen., Augusta, for plaintiff.

Cloutier, Joyce, Dumas & David, Edward H. Cloutier, Livermore Falls, Cloutier, Joyce, Dumas & David, Paul R. Dumas, Jr. (orally), Rumford, for Richard D. Kimball.

Turner & Whittier, P. A., Craig E. Turner (orally), South Paris, for Randolph Lord.

Before McKUSICK, C. J., and WERNICK, GODFREY, NICHOLS, GLASSMAN and ROBERTS, JJ.

WERNICK, Justice.

Separately indicted for having committed the crime of murder in violation of 17–A M.R.S.A. § 201(1)(A) and (B)[1], defendants Richard D. Kimball and Randolph R. Lord were tried together before a jury in the Superior Court (Oxford County). At the trial neither defendant took the witness stand to testify in his own behalf. The jury found each defendant guilty of murder as charged, and each defendant has appealed from the judgment of conviction entered against him.

---

1. Each indictment read the same, except for the name of the defendant, and charged as follows:

"on or about the 21st day of June, 1979 in the County of Oxford and State of Maine, Richard D. Kimball [Randolph R. Lord] did intentionally or knowingly cause the death of Frank Carkin or did engage in conduct which manifested a depraved indifference to the value of human life and which in fact caused the death of Frank Carkin."

In addition to showing that defendants had made extra-judicial statements implicating them in the murder of Frank Carkin, the evidence established the following other facts. Defendants had been together with a third person, Richard D. Kimball, Jr., (Junior), apparently no relative of defendant Kimball, most of the afternoon of June 21, 1979. They then made plans in the presence and hearing of Junior to rob one Frank Carkin while he was at his house situated behind the American Legion Hall in Locke Mills. That evening, defendants drove with Junior to the vicinity of Carkin's house. Junior separated from defendants, who then proceeded on foot toward the house. Later, when defendants were driving on Route 26 near the American Legion Hall, they picked up Junior. He rode with both of them until defendant Lord left the automobile and defendant Kimball drove Junior home. The next afternoon Carkin's dead body, severely beaten, was found in his house.

Defendants raise four basically identical points on appeal: (1) violation of the "Confrontation" guarantee of the Sixth-Fourteenth Amendments to the Constitution of the United States because of the admission in evidence of certain extra-judicial statements of defendants; (2) error by the presiding justice in rulings made by him, adverse to defendants, regarding allegedly inflammatory and impermissibly prejudicial questioning, and also closing argument, by the prosecutor; (3) error in the instructions given by the presiding justice authorizing the jury to find either defendant guilty of murder, as charged by the indictment against that particular defendant, notwithstanding that the jury had concluded that only the other defendant did the acts constituting the murder of Carkin; and (4) insufficiency of the evidence to support the convictions.

We deny the appeals and affirm the judgments of conviction.

### 1. The Confrontation Issue.

Defendant Kimball contends that his constitutional right to confrontation was violated by the admission in evidence of extra-judicial statements made by defendant Lord to Robert Goddard, a correctional officer of the Oxford County Sheriff's Department, and to Oxford County Deputy Sheriff Peter Madura.

The statement to Goddard, as he described it in his testimony at trial, was:

"Q. What were the circumstances surrounding this conversation that you had with Mr. Lord? Had something just occurred that led to the conversation?

"A. He was in the dining area of the jail waiting for a visit, and he wanted me to get his money out that had been taken when he arrived to give to somebody who was bringing cigarettes in for him.

"Q. And what did you tell him about the $20.00?

"A. I told him that the State Police investigators had taken it as evidence to see if they could take fingerprints off of it of a Mr. Carkin.

"Q. And what did he do when you said that?

"A. He said, 'Oh, shit', and he hung his head, and his face started to quiver.

"Q. Did he do anything else?

"A. Well, it looked like he was crying."

Deputy Mandura testified at trial that the extra-judicial statement made to him by defendant Lord was as follows:

"Q. And while you were standing there, what was Mr. Lord doing?

"A. He was just standing there with his head down, more or less thinking to himself.

"Q. He was standing there with his head down?

"A. Yes.

"Q. Did he say anything while he was standing there?

"A. Yes, he did.

"Q. And what did he say?

"A. He said that he didn't kill him, he didn't kill him, he beat him up, he was still alive when he left."

It is plain that defendant Lord's extra-judicial statements both to Officer Goddard and to Deputy Sheriff Mandura, properly admissible in evidence against Lord as his own admissions, in no way referred to, or implicated, defendant Kimball. These admissions of defendant Lord therefore had no potential for the impermissibly prejudicial carry-over impact against Lord's co-defendant Kimball that, pursuant to *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), would produce a violation of Kimball's constitutional right to confrontation. *See State v. Wing*, Me., 294 A.2d 418, 422 (1972).

Defendant Lord claims a violation of his constitutional right to confrontation because extra-judicial statements made by defendant Kimball to Junior, as well as to one Wendy Damon, were allowed in evidence.

Wendy Damon testified at trial to the following extra-judicial statement defendant Kimball made to her in the course of a conversation between them that occurred after the Carkin killing:

"Q. Did you have a conversation with him?

"A. Yes.

"Q. And did that conversation involve an exchange of information of some sort about the homicide in Locke Mills?

"A. Some of it.

"Q. Did he make any statement to you about having an amount of money that had come from the old man in Locke Mills?

"A. Yes.

"Q. And what did he say in regards to that?

"A. He said he had to get rid of it.

"Q. Did he say how much he had?

"A. Yes.

"Q. How much was it?

"A. $250.00.

"Q. Of that guy's money?

"A. Yes."

Plainly, this extra-judicial statement says nothing about any other participants in the robbery and neither directly nor indirectly implicates Kimball's co-defendant Lord. Hence, as shown by our prior analysis regarding defendant Lord's extra-judicial statements, the admission in evidence of defendant Kimball's extra-judicial statement to Wendy Damon did not violate defendant Lord's constitutional right to confrontation, as implemented by *Bruton v. United States, supra.*

The extra-judicial statements made by defendant Kimball to Junior, as testified to by Junior at the trial, were the following.

First, there was a statement to Junior when defendant Kimball was alone with him after defendant Lord had left the automobile, made while defendant Kimball ("Dickie") was driving Junior home. It was as follows:

"A. Dickie brought me home.

"Q. When Dickie got you home, did Richard D. Kimball say anything to you?

"A. Yes.

"Q. What did he say?

"A. He said that if I ever told anybody about it that he would kill me."

The other extra-judicial statement by defendant Kimball, of which defendant Lord complains, was made during the course of an ongoing conversation among Kimball, Lord and Junior while the three of them were riding in the automobile immediately after the incident at the Carkin house. As testified to by Junior, this conversation proceeded as follows:

"Q. Did either Randolph Lord or Richard D. Kimball say anything while you were around that area?

"A. Yeah.

"Q. Who said what?

"A. Well, I asked what happened, and Randy said that they had killed him.

"Q. Did he say anything else?

"A. Yeah, he said he kept choking him and choking him, and he wouldn't die, and all that stuff.

"Q. Did you ask Mr. Richard D. Kimball anything about that?

"A. Yes, I asked him what really happened.

"Q. And what did he say?

"A. He just said that Randy just totalled him.

"Q. Did you keep on riding?

"A. Yes."

■ The first of these two extra-judicial statements, made in the absence of defendant Lord, was properly receivable in evidence against defendant Kimball as his own admission. Within its own confines Kimball's statement makes no reference to defendant Lord. If by the reference to "it," in potential interrelationship with other admissible evidence as to what defendant Lord had done to Carkin, this Kimball statement could be taken as an indirect reference to Lord, any resulting incriminating effect as to Lord arises from the other admissible evidence, *not* from the extra-judicial statement by Kimball. Hence, the receiving of Kimball's statement in evidence, as evidence against defendant Lord, does not precipitate the violation of defendant Lord's right to confrontation that *Bruton, supra*, addressed.

The three way conversation in the automobile and, more particularly, defendant Kimball's statement that "Randy just totalled him" involves, plainly, an out of court assertion by defendant Kimball as the declarant incriminating his co-defendant Lord. As such, the statement has a surface appearance of being, under *Bruton, supra*, a violation of defendant Lord's constitutional right to confrontation. Penetrating beneath the surface, however, the presiding justice allowed the statement in evidence as properly receivable against defendant Lord without violation of *Bruton*, on the ground that it was in legal effect Lord's *own* admission, "a statement of which he . . . manifested his adoption or belief in its truth." Rule 801(d)(2)(B) M.R.Evid.

■ In so ruling, the presiding justice acted without error. This was not a situation in which defendant Lord was merely present when defendant Kimball made his extra-judicial statement. Neither does the context present the difficult question whether, and in what circumstances, the mere silence of one who becomes a defendant in a criminal prosecution, and who had heard and understood the extra-judicial statement of another, may be charged with that statement as his own admission by "adoption." *See* R. Field and P. Murray, *Maine Evidence*, § 801.5 at 194, 195. Here, defendant Lord was actively participating in a three way conversation with defendant Kimball and with Junior. Just before Kimball made the extra-judicial statement at issue, defendant Lord had contributed to the conversation with his own remark that he had "kept choking him [Carkin] and choking him, and he wouldn't die . . . .." Defendant Kimball's immediately following statement: "Randy [defendant Lord] just totalled him [Carkin]" was thus only a direct repetition of what defendant Lord himself had just admitted. In these circumstances it was plainly open to the presiding justice, who has the function of finding the preliminary facts that are the preconditions of the admissibility of a particular item of proffered evidence, to find that defendant Lord "ha[d] manifested . . . [an] adoption or belief in . . . [the] truth" of defendant Kimball's statement.

On this basis, then, the presiding Justice was correct in his conception that to allow in evidence, against defendant Lord, Kimball's extra-judicial statement, as found in the circumstances involved here to be defendant Lord's own admission by adoption, *see, State v. Anderson*, Me., 409 A.2d 1290, 1298–1299 (1979), did not violate the constitutional protection afforded defendant Lord by the Confrontation Clause. That protection is the guarantee of opportunity for cross-examination, to expose the possible unreliability of evidence. Since, however, the traditional common law rationale for receiving the extra-judicial admission of a party in evidence against him is that a party "cannot object to his failure to have a chance to cross-examine himself", i. e., to "confront" himself, see R. Field and P. Murray, *Maine Evidence*, § 801.5 at 193, there is no reasonable basis for applicability of the Confrontation Clause as to a party's admis-

sions. *Cf. Bruton v. United States, supra,* 391 U.S. at 128 n. 3, 88 S.Ct. at 1623, n. 3; *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970).

## 2. The Issue of Improper Prosecutorial Questioning and Closing Argument.

When Junior was testifying, the last question the prosecutor asked him was:

"And is it fair to say that you find it difficult to believe that anybody could have done that [the attack on Carkin] to another human being?"

Before Junior could answer the question an objection was made, and the presiding justice immediately instructed the jury to disregard the question.

■ The State concedes, and we agree, that the prosecutor's question was improper. We conclude, nevertheless, that the presiding justice's immediate instruction to the jury to disregard the question so attenuated the potential of impermissible prejudice to defendants that the fact alone that the question was asked by the prosecutor does not warrant setting aside the convictions.

In the course of his rebuttal closing argument to the jury, when he was discussing testimony given by Junior, the prosecutor made the following statement:

"[MR. BUNKER:] . . . Junior's behavior is interesting, and you've got it in two different stages. You have got Junior's behavior at the American Legion, and that behavior is at a time before he knows what has occurred up there. What may be going to occur up there may be nothing more than an entry not knowing whether Carkin is there or not, a burglary, in which case nothing will happen, and for him to go over here and call down the forces of the law on Mr. Lord and Mr. Richard D. Kimball can result in some very horrendous things happening to him.

"MR. CLOUTIER: I am going to object, Your Honor. I think this is improper.

"THE COURT: I will overrule your objection.

"MR. BUNKER: Some bad things can happen to Junior when these fellows are released, and he finds out that they were turned into the people down at the Legion and the cops being called while they were going up there. Maybe they will get off because nothing has happened, if in fact he had done it. It's too darned bad he didn't because he might have prevented Carkin's death, but that he could not foresee. His desire is to get away from there without being picked up and being a part of it, and his story that he made up a couple of names, if he made up George Wentworth and Billie Heath, maybe he had heard Heath, and he wouldn't remember. You make up names of people that you just heard the name, or may not have heard, and you may not remember those later when asked. I would suggest that that is an explanation.

"Now his behavior afterwards is a different story. When he came to the police and told this story with the numerous things that could be verified, the people that had seen them together, the fact that it was Lord's car, and he was aware that people could identify them. He is now aware that Carkin has been killed up there, and these men, Lord and Kimball, have told him that they did go up there and commit the robbery and got some money and left the man dead, and the last thing that was said to him when he gets out of the car at home, 'You say anything to anybody, and I'll kill you.' When he went to the police to tell his story, and to try to convince them that he had nothing to do with it, and to tell what he knew about it, he was trying to save his life, because he was in fear at that point that if he didn't come forward, either he would be swept up in the overall grab when the police found out who belonged in that car that was outside of the Legion Hall at about 9 o'clock, or 9:30, or he would be the next victim of Lord and Kimball, Richard D. Kimball, and Kimball had told him that he would do if he went to the police. He did anyway, and when you heard him here,

you're the ones that are going to have to judge whether he is telling the truth."

As the above quoted extract discloses, the attorney for defendant Kimball interposed an objection without stating specifically the underlying ground. The record reveals, too, that at the close of the prosecutor's rebuttal argument defendants made motions for a mistrial on the grounds of inflammatory and impermissibly prejudicial remarks by the prosecutor in his rebuttal argument, and defendants expressly called to the justice's attention the particular remarks they regarded as impermissibly, and irretrievably, prejudicial. However, in that context, they made no mention whatever of the prosecutor's comments about Junior's testimony.

▮ We must conclude, then, that defendants did not save, as error to be given appellate cognizance in ordinary course, the issue of the prosecutor's remarks regarding Junior's testimony. We therefore review this claim of error only in the context of its having been "obvious error" inconsistent with defendants' having had a fair trial.

We find no such "obvious error." Whether or not some of the prosecutor's language may have suggested to the jury that an acquittal of defendants would give them opportunity to cause harm to Junior, the point nevertheless remains that, in substance, the prosecutor's argument was legitimate to the extent that it sought to buttress Junior's credibility against attacks made upon it by defense counsel. The argument was, fundamentally, that the jury should not regard Junior's credibility as suspect because Junior had withheld from law enforcement authorities as long as he did information about the conduct of defendants, as he had gleaned it both when he had heard them planning to rob Carkin and as he had heard them talking, in the automobile, after they left Carkin's house. The prosecutor was seeking to convince the jury that Junior had good reason, both before and after the incident at the Carkin house, to fear that he would suffer serious bodily injury, or death, if he did not cooperate with the defendants. Such argument could

fairly be deemed supported by the evidence, since Junior had testified that while the defendants were planning the robbery of Carkin, he protested that he did not wish to go along with it, and he was brusquely told to keep quiet. The evidence showed that the defendants were serious about having Junior continue to cooperate with them. They fired a shotgun in Junior's presence and also forced him out of the automobile at gunpoint shortly before they left the automobile to go on foot to the Carkin house. Moreover, later, when defendant. Kimball was driving Junior home, he threatened to kill Junior if he told anyone about what had happened.

In light of these circumstances in evidence, we cannot say that defendants were deprived of a fair trial by the prosecutor's effort to reconstruct Junior's credibility by arguing the point that Junior's hesitation in reporting defendants to law enforcement officials arose from his fear that defendants would cause him harm if he went to the police. We so decide more particularly because the presiding justice had specifically instructed the jury:

"Statements of counsel are not evidence. We permit counsel to make an opening statement and make a final argument, . . . their remarks never rise to the level of evidence, and should not be considered by you in any way as being evidence that you would rely upon in making a decision in this case."

Defendants did save their claims of error regarding two other comments by the prosecutor in his rebuttal closing argument, by having expressly referred to these comments as the grounds supporting their motion for a mistrial.

▮ One of the claims of error thus saved concerns the prosecutor's concluding remark to the jury:

"I would also like to extend my thanks along with that of the other attorneys for the close attention that you have paid throughout the case, and because of the sequence in which things will take place tomorrow, and when you return your ver-

dict, on behalf of all of us, Merry Christmas. Thank you."

We reject out of hand, as refuted merely by being asserted, defendants' claim that a mistrial should have been granted because, as defendants argued to the presiding justice, it was "improper for the State's counsel to wish the jury a Merry Christmas, particularly at this time [December 21st]. I am certain that the Court will do it tomorrow."

The other comment by the prosecutor asserted as a ground for a mistrial was the following reference by name to defendant Kimball's attorney:

"The next time we get a homicide, obviously, for the investigation we should contact Mr. Cloutier . . . ."

A colloquy in the hearing of the jury immediately ensued:

"MR. CLOUTIER: If Your Honor, please, I would like to approach.

"THE COURT: I will see counsel at side bar.

"MR. BUNKER: I will terminate at that point, Your Honor. And I apologize to Mr. Cloutier."

Then, continuing his argument to the jury, the prosecutor added:

"I also think that there would have been things that the labs might have done. I suspect that that may be true, and I suspect also that what they did is enough to convince you beyond a reasonable doubt of what really occurred up there that night, and I would suggest that when you return your verdict against both of these Defendants . . . it will be guilty of murder as charged."

The prosecutor's remark referring to Attorney Cloutier personally was occasioned by Attorney Cloutier's closing argument to the jury on behalf of defendant Kimball, in which he had commented on the inadequacy of the State's investigational procedures and how he would have done it. When defendants claimed a mistrial on the ground that the prosecutor's remark about Attorney Cloutier was impermissibly prejudicial, the presiding justice commented:

"Well, I think that with regard to the statement that Mr. Bunker made, that obviously is one I would not encourage counsel to make, but a good deal of latitude was taken by counsel throughout final arguments, and I think it is equally improper, Mr. Cloutier, for you to state as you did several times what you thought about the procedures, and how you would do it. This is not the type of statement I would interrupt you for, but it is improper, and I think the little retort you got—the tests should be run through the crime lab—and the colloquy within the context of the arguments as made, that it was a harmless remark, and certainly not any more improper than the argument you made."

■ Although we do not endorse as accurate in theory the justice's observation that the impropriety of one attorney's conduct may warrant retaliation in kind by another attorney, thereby to compound improper trial behavior by attorneys, we recognize an earthy wisdom in the justice's approach, in light of all the circumstances, to the prosecutor's remark about Attorney Cloutier.

The justice did not abuse the discretion reposed in him to grant, or deny, a mistrial, *State v. Viger*, Me., 392 A.2d 1080 (1978), by denying a mistrial in this particular instance on the ground that the prosecutor's remark was "harmless."

*3. The Instruction Authorizing the Conviction of One Defendant of Murder, Even Though the Other Defendant Alone Did the Act of Killing Constituting Murder.*

We have chosen to identify the issue now to be considered by the neutral phrasing used in the title because the language of the defendants' attorneys in arguing this point on appeal is ambiguous and resorts to "catch" words that suggest confusion as to the exact position being asserted. We shall discuss separately two points we glean from defendants' arguments.

By one formulation of their contentions defendants appear to be asserting that the presiding justice erred because, as they say,

he gave the jury an instruction which authorized a conviction on the basis of "felony-murder", even though the instant indictments do not charge "Felony murder" as defined in 17–A M.R.S.A. § 202[2] but, rather, charge "Murder" as the separate and distinct, and more seriously punished, offense defined in 17–A M.R.S.A. § 201.

This contention is unsound. We are satisfied that the instructions by the presiding justice did not purport to be, and were not, an authorization to the jury to find either defendant guilty of the offense of "Felony murder" as the separate and distinct offense defined in Section 202. Rather, the presiding justice's instructions purported to be, and were, instructions authorizing a finding of guilt of the offense of "Murder" committed in violation of Section 201, on the basis of the *accomplice* rationale of accountability delineated in 17–A M.R.S.A. § 57(1) in combination with the *second sentence* of 17–A M.R.S.A. § 57(3)(A).[3]

True, such guilt of a defendant as an accomplice to the crime of "Murder" committed by another person in violation of Section 201 may resemble guilt of the offense of "Felony murder" as defined in Section 202, more particularly because in each instance the guilt arises from a common element that a homicide committed by another person is found to have occurred as "a reasonably foreseeable consequence." See *State v. Anderson*, Me., 409 A.2d 1290, 1302, 1306 (1979).

■ Despite such similarity, there is nevertheless a critical difference between "accomplice" guilt of the crime of "Murder" in violation of Section 201 and guilt of the separate and distinct offense of "Felony murder" in violation of Section 202. This critical difference relates to the *nature* of the homicide required to be "a reasonably foreseeable consequence." The guilt of defendant A of Section 202 "Felony murder" can arise because a person's *death* is caused by the actions of defendant B alone, even though the circumstances are *not* such that defendant B's conduct in causing the *death* becomes *"Murder"*, in violation of Section 201. In contrast, defendant A's guilt of Section 201 "Murder", by reason of "accomplice" accountability under Section 57(1) in combination with the second sentence of Section 57(3)(A), can arise *only if*, as an indispensible element, the commission by defendant B of *the crime of Section 201 "Murder"* was "a reasonably foreseeable consequence of . . . [the] conduct" of defendant A described in the first sentence of Section 57(3)(A).

■ From our reading of the entirety of the presiding justice's charge to the jury we conclude that he adequately instructed the jury to avoid confusion regarding this critical distinction. The jurors were told that were they to find that one of the defendants alone did the acts causing Carkin's death, they were authorized to find the other defendant guilty of Murder, as here charged, on the rationale of "accomplice" accountability only were they also to find that what was a reasonably foreseeable consequence was the killing of Carkin in circumstances making the killing the crime of Murder. Nowhere in his charge did the

---

**2.** As here pertinent 17–A M.R.S.A. § 202 provides:

"A person is guilty of felony murder if acting alone or with one or more other persons in the commission of, or an attempt to commit, or immediate flight after committing or attempting to commit murder, robbery, burglary, kidnapping, arson, rape, gross sexual misconduct, or escape, he or another participant in fact causes the death of a human being, and such death is a reasonably foreseeable consequence of such commission, attempt or flight."

**3.** 17–A M.R.S.A. § 57(1) states:

"A person may be guilty of a crime if it is committed by the conduct of another person for which he is legally accountable as provided in this section."

Section 57(3) reads:

"A person is an accomplice of another person in the commission of a crime if:

"*A.* With the intent of promoting or facilitating the commission of the crime, he solicits such other person to commit the crime, or aids or agrees to aid or attempts to aid such other person in planning or committing the crime. A person is an accomplice under this subsection to any crime the commission of which was a reasonably foreseeable consequence of his conduct; . . .."

justice explain accomplice accountability for Section 201 "Murder" by using merely the word *death* (of Carkin) to describe what must have occurred as a reasonably foreseeable consequence of the undertaking to rob Carkin. Rather, the justice always used the word "murder", which he had already carefully explained to the jury in terms of the essential elements delineated in Section 201, to direct the jury's attention to what they must find had in fact occurred and what they must find to have been a reasonably foreseeably consequence of either defendant's participation in the robbery of Carkin.

The justice, therefore, did not commit the error of authorizing the jury to convict either defendant, as here charged by indictment for Section 201 "Murder", of the separate and distinct crime of Section 202 "Felony murder."

We discern what appears to be a second position underlying defendants' general contention that the presiding justice erroneously authorized the conviction of defendants for "felony-murder." It arises from defendants' statements that defendant A cannot be accountable as an *accomplice* for a crime constituted by acts done by defendant B unless defendant A's activity embodied the same kind of culpability that is an element of the crime committed by defendant B for which A is sought to be held responsible as an accomplice.

■ Defendants say that the presiding justice's instructions omitted to explain this requirement to the jury, most especially as to the culpable state of mind required for Murder as an "intentional or knowing killing" under Section 201(1)(A), and therefore the justice committed reversible error.

We reject this argument on the authority of *State v. Goodall*, Me., 407 A.2d 268 (1979), in which we decided that

"the legislature . . . intended to impose liability upon accomplices for those

crimes that were the reasonably foreseeable consequence of their criminal enterprise, notwithstanding an absence on their part of the same culpability required for conviction as a principal to the crime." *Ibid.*, at 278.

### 4. The Sufficiency of the Evidence.

Defendants argue that the proof of guilt is constituted, here, by circumstantial evidence in combination with defendants' admissions of guilt to other persons. Even so, however, that does not preclude a rational trier of fact from finding defendants guilty, as charged, beyond a reasonable doubt.

■ The evidence was sufficient to support a jury finding beyond a reasonable doubt that defendant Lord was the person who inflicted upon Carkin the severe beating causing his death, and that he was, therefore, guilty of murder, as charged, because he "intentionally or knowingly" killed Carkin, or else caused his death by "engag[ing] in conduct which manifest[ed] a depraved indifference to the value of human life."

■ We conclude that the evidence was also sufficient to support a jury finding beyond a reasonable doubt that defendant Kimball was accountable as an accomplice for the Section 201 Murder of Carkin committed by defendant Lord and that, therefore, defendant Kimball was guilty of murder in violation of Section 201, as charged in the indictment against him.

■ The evidence showed that while the defendants were planning to commit a robbery at Carkin's house, defendant Kimball conceived the idea and stated aloud: "We ought to go in and shoot him [Carkin]." In addition, defendants drove to the vicinity of Carkin's house with a gun. With the shooting of Carkin thus an expressly mentioned prospect by defendant Kimball,[4] and with defendants having a gun, the jury was war-

---

**4.** It is not an *essential* element of defendant Kimball's being accountable as an accomplice, even though the jury could well find that it was the fact here, that defendant Kimball actually foresaw as his *own subjective* state of mind the probability of Carkin's being murdered. The

"reasonably foreseeable consequence" requirement sets forth an *objective* criterion, i. e., what the average reasonable person would foresee in all the circumstances. The presiding justice instructed the jury, here, on the basis of the objective criterion, and this was correct.

ranted in finding that the murder of Carkin, in violation of Section 201, was a "reasonably foreseeable consequence of ... [the] conduct" of defendant Kimball in planning and otherwise aiding and abetting in the robbery at Carkin's house.

■ The validity of this conclusion is not impaired because Carkin was murdered by being severely beaten instead of being shot. We decide that it is not compatible with the public policy underlying the accomplice accountability formulated in the second sentence of Section 57(3)(A) that such accountability depend on the further refining consideration whether or not the murder which eventuated occurred in the particular manner that may have been reasonably foreseeable. We hold that it is requisite for accomplice accountability to murder only that some set of circumstances constituting murder in violation of Section 201 be a reasonably foreseeable consequence and therefore that it is without legal significance that the Section 201 murder actually committed was constituted by different circumstances which, fairly regarded, are neither freakish nor outlandish relative to the foreseeable circumstances.

The entries shall be:

(1) The appeal of defendant Kimball is denied, and the judgment of conviction against him is affirmed;

(2) the appeal of defendant Lord is denied, and the judgment of conviction against him is affirmed.

All concurring.