**STATE of Maine**

v.

**Steven Russell BENNETT et al.**

Supreme Judicial Court of Maine.

Argued Jan. 5, 1995.

Decided May 23, 1995.

Andrew Ketterer, Atty. Gen., Wayne S. Moss (orally), Asst. Atty. Gen., Augusta, for State.

Joel Vincent (orally), Altshuler & Vincent, Portland, for Steven Bennett.

Matthew Nichols (orally), Boulos & Gardner, Biddeford, for Michael Maldonado.

Neal A. Duffett, Cloutier, Barrett, Cloutier & Conley, Portland, for Michael Tuck.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, RUDMAN, and DANA, JJ.

DANA, Justice.

Steven R. Bennett, Michael A. Tuck, and Michael J. Maldonado appeal from judgments entered in the Superior Court (Cumberland County, *Lipez, J.*) on jury verdicts convicting both Bennett and Maldonado of criminally negligent manslaughter, 17–A M.R.S.A. § 203(1)(A) (Supp.1994), and assault, 17–A M.R.S.A. § 207(1) (1983), and convicting Tuck of two counts of assault, *id.*, arising out of a brawl that led to the death of Randal Toler. Bennett and Maldonado argue that the court erred by excluding from evidence a statement by Toler tending to show his aggressiveness just prior to the fatal altercation. All three defendants argue that they were deprived of a fair trial as a result of statements made by the State in its closing argument. Finally, Bennett argues that there was insufficient evidence to convict him of criminally negligent manslaughter. Finding no reversible error, we affirm the judgments of conviction.

## I. Facts

The facts as developed at trial may be summarized as follows. On the night of June 17, 1992, Steven Bennett and Lisa DePrez were at DeNan's Bar in Portland. DePrez and Bennett flirted with each other. Later DePrez ran into her one-time boyfriend, Randal Toler, who had just returned to Portland and whom she introduced to Bennett. Also at DeNan's were Bennett's friends, Michael Tuck and Stacey Karaffa, and Toler's friend Edward Keeley.

At some point Toler pinched Karaffa and called her a "bitch" when she reacted negatively to the pinch. On leaving DeNan's, Toler proceeded to urinate in the street. Karaffa, who was standing nearby, expressed her disapproval of this conduct. Toler attempted to apologize explaining that he was drunk. Karaffa continued to argue with Toler and he responded by stepping in the puddle of urine and wiping his foot on Karaffa's clothing. Karaffa became further angered and reentered DeNan's.

At some point thereafter Karaffa told Stacy Favro that Bennett and Tuck were going to fight Toler. Karaffa then left DeNan's with Bennett and Tuck. As he left the bar, Tuck asked the manager whether he would be allowed back in if he got in a fight. The manager responded that he did not care as long as the fight was not around the building.

Outside and up the street from DeNan's were Toler, Keeley, and DePrez. Karaffa motioned to Toler to come back to DeNan's so she could apologize for her comments to him. At the same time Tuck went over to his bicycle, took the chain off and wrapped it around his hand. Tuck then returned to where Karaffa and Bennett were standing. Karaffa stepped away leaving Bennett and Tuck to confront Toler and Keeley.

Keeley said something about the chain in Tuck's hand, whereupon Tuck punched Keeley in the head. Keeley was knocked unconscious. Michael Maldonado, a friend of Bennett, appeared on the scene and Maldonado, Bennett, and Tuck began assaulting Toler. They punched, kicked, pushed, and shoved him. The manager of DeNan's, along with others, broke up this confrontation leaving Toler lying on the street.

When Toler regained his feet, however, Maldonado, Bennett, and Tuck initiated a second attack on Toler that lasted approximately two minutes. All three of them shoved, kicked, and punched Toler. Tuck withdrew from the altercation, but Bennett and Maldonado continued to attack Toler as they pushed and threw him to the other side of the street. Toler could barely stand and was staggering about unable to react or defend himself.

In the end the fight moved in front of a large store window. As Toler stood in front of the window, Bennett punched Toler in the face. Gordon "Damien" Kezer attempted to intervene, but was able to restrain only one attacker at a time. He grabbed Bennett, at which point Maldonado kicked Toler in the face. Kezer kicked Maldonado away from Toler, but then Bennett struck Toler in the head again. Kezer again tried to restrain Bennett, whereupon Maldonado grabbed Toler and pushed him against the glass window, which "spidered out." Bennett attempted to swing at Toler, but was restrained by Kezer. Maldonado then pushed Toler into the glass which shattered. Toler sustained a fatal wound from the shattered glass. As Toler was falling to the ground Bennett kicked him a final time.

Bennett and Maldonado then walked away from Toler. As they departed, they "high-fived" each other. Bennett hollered back at Toler, "Next time I will kill you" and "we will get knives or a gang." Bennett also flexed his muscles and struck poses mimicking a bodybuilder.

A grand jury returned a five-count indictment that charged: (I) Bennett and Maldonado with depraved indifference murder of Toler; (II) Bennett and Maldonado with reckless or criminally negligent manslaugh-ter of Toler; (III) Bennett, Maldonado, Tuck, and Karaffa with aggravated assault on Toler; (IV) Tuck with assault on Toler; and (V) Tuck with aggravated assault on Keeley. The State subsequently amended Count III to charge simple assault instead of aggravated assault.

On June 24, 1993, a jury trial commenced in the Superior Court. On July 14 the court eliminated Count II but instructed the jury on criminally negligent manslaughter as a lesser included offense of Count I. On July 16 the jury returned a verdict finding Bennett and Maldonado (1) not guilty of depraved indifference murder; (2) guilty of criminally negligent manslaughter; and (3) guilty of assault. It found Tuck not guilty of aggravated assault, but guilty of two counts of assault. It found Karaffa not guilty of assault. Judgments were entered on these verdicts and these appeals followed.

## II. Exclusion of Toler's Sexually Explicit Remark

At the trial the court excluded from evidence, pursuant to a motion *in limine*, the testimony of Michelle Gregoire and Sally Davies that, shortly before the fatal confrontation and in the presence of Lisa DePrez and Donna Colello, Toler approached them and explicitly described certain sexual conduct that he wanted to engage in with them. Bennett and Maldonado contend that the court erred when it refused to admit this testimony. They argue that these comments were properly admissible because they tend "to show that Toler was volatile, aggressive and fearsome moments before the fight" and tend to impeach two State witnesses. We disagree.

### A. Relevance to Self–Defense

■ A person may justifiably use deadly force when that person reasonably believes it necessary and reasonably believes the other person is about to use unlawful, deadly force against him or another person. 17–A M.R.S.A. § 108(2)(A)(1) (Supp.1994). Evidence of a person's character or of a person's bad acts is not admissible to prove that that person acted in conformity therewith. M.R.Evid. 404. Thus, evidence of a victim's

violent nature is "clearly inadmissible." *State v. Mitchell,* 390 A.2d 495, 501 (Me. 1978). This rule, however, "does not keep out the victim's reputation for violence, *proved to have been known to the accused* before the event, for the purpose of showing his reasonable apprehension of immediate danger." M.R.Evid. 404 advisor's note (emphasis added). Unless the accused is aware of the victim's reputation or past acts, the exclusion of such evidence is not erroneous. *State v. Leone,* 581 A.2d at 394, 400. Even if the accused is aware of a victim's reputation, evidence of that reputation may still be excluded pursuant to M.R.Evid. 403 if its probative value is substantially outweighed by the danger of confusing and misleading the jury. *State v. Tanguay,* 574 A.2d 1359, 1362 (Me.1990).

■ The court determined that the statement by Toler should not be admitted in evidence pursuant to the exception to M.R.Evid. 404 because there was no evidence that the defendants were aware of the statement prior to engaging in the charged conduct. Indeed, the defendants did not argue then and do not argue now that they were aware of Toler's statement. They argue only that the statement is "probative of mind set and mood changes capable in Randal Toler." The court did not abuse its discretion when it refused to admit this evidence in support of the defendants' claims of self-defense.

### B. Impeachment Purposes

■ A criminal defendant has the right to introduce evidence tending to impeach the credibility of a State's witness. *State v. Warren,* 312 A.2d 535, 544 (Me.1973). "The extent and scope of impeachment testimony lies within the limits of judicial discretion." *State v. Cedre,* 314 A.2d 790, 799 (Me.1974). "[D]iscretion is considered abused ... if the ruling arises from a failure to apply principles of law applicable to a situation resulting in prejudice." *Warren,* 312 A.2d at 544.

■ Bennett and Maldonado argued at the trial that Toler's sexually explicit statement impeached both Deprez and Colello because both denied hearing it even though they were in positions to do so. The court excluded only the content of the statement. It permitted the defendants to impeach Donna Colello by presenting the fact that Toler had contact with the two women and made a statement to them that should have been heard by Colello. Bennett agreed that this ruling permitted impeachment of Colello. With respect to the impeachment of DePrez, there was no evidence that DePrez was in a position to have heard the statement. Accordingly, the court's ruling to exclude the content of the statement was not an abuse of discretion.

### III. State's Closing Argument

The defendants argue that they were denied a fair trial as a result of 42 improper statements made by the State during its closing argument. The defendants moved for mistrials in response to two of these statements, but failed to make timely objections to the other 40. We address whether the court abused its discretion when it refused to grant the defendants' motions for mistrial, *State v. Dube,* 522 A.2d 904, 908 (Me.1987), and whether any of the 40 unpreserved allegations of error rise to the level of obvious error. *State v. Comer,* 644 A.2d 7, 9 (Me.1994).

### A. Motions for Mistrial.

In its closing argument, the State made the following statement:

> The testimony, ladies and gentlemen, in this case has brought you face-to-face with murder and with murderers who are within your midst. Fortunately, the sterility, the formality, the security of the courtroom protects you.

The State concluded its rebuttal argument as follows:

> And it is said that—by Mr. Nichols and Mr. Vincent—that what happened was a tragedy. Crimes are no more than a society's moral judgment about what is acceptable or unacceptable behavior. If this is your idea of no crime, of acceptable behavior, then I can say only to you we are in tough shape. To use Mr. Nichols words this death was a tragedy. A little girl dies of leukemia, that's a tragedy. This was an atrocity.

After the close of all the arguments the defendants joined in motions for mistrials on the basis of the impropriety of these statements.

The court determined that the first statement was "inappropriate," but that it did not justify a mistrial. Although the court offered to give a curative instruction, the defendants requested that none be given. The court also denied the motion for mistrial with respect to the second statement, but noted that it would have sustained a timely objection and given a curative instruction. Pursuant to the suggestion of Maldonado, and without objection from the other defendants, the court gave a curative instruction in its charge to the jury.[1] The defendants now argue that these unfairly prejudicial remarks could not be cured by an instruction and therefore the trial court's refusal to grant a mistrial was an abuse of discretion. We disagree.

 The State has an overriding obligation to see that an accused receives a fair trial. *State v. Pineau*, 463 A.2d 779, 781 (Me.1983). The State's injection of "extraneous matters of fear" into a case is improper because the jury's "[i]nstincts of self-preservation cannot serve as a surrogate for detached evaluation of guilt or innocence." *Id.* We will find an abuse of discretion when a trial court refuses to give a curative instruction after the State so prejudices a jury. *See id.* at 780–81 (finding abuse of discretion when court refused to give curative instruction after the State told the jury to base its verdict on whether it would want to drive on same road as defendant).

 We have also recognized that the trial court is in the better position to gauge the impact of claimed objectionable statements. *Dube*, 522 A.2d at 909.

Broad discretion is accorded to the exercise of judgment by the trial judge in deciding whether the circumstances at the time of the motion necessitate the declaration of a mistrial, instead of resorting to the less drastic action of giving a curative instruction. "Only where there are exceptionally prejudicial circumstances or prosecutorial bad faith will a curative instruction be deemed inadequate to eliminate prejudice."

*Id.* at 908 (citation omitted) (quoting *State v. Hilton*, 431 A.2d 1296, 1302 (Me.1981)). Moreover, unless there is evidence to the contrary, we assume that the jury followed the trial court's instructions. *State v. Osgood*, 505 A.2d 478, 480 (Me.1986).

 We agree with the trial court and the defendants that both of these statements were inappropriate. Through the first statement the State improperly appealed to the fears of the jurors, thereby injecting concerns for their personal safety into their deliberations. Through the second statement the State encouraged the jurors to consider community sentiment in deliberating on the verdicts in this highly publicized case. Particularly disconcerting is the fact that the State made the first statement in its introductory remarks. It was not an offhand, spontaneous comment. It was a deliberate and premeditated statement, obviously beyond the parameters of proper argument and inconsistent with the State's overriding obligation to see that the accused receive a fair trial.

Still, the trial court either gave or offered to give a curative instruction for each statement. It carefully evaluated the circumstances and impact of these statements, considered its alternatives, and chose to deny the motions for mistrials. We are not convinced that these two statements in this particular case created the type of "exceptionally prejudicial circumstances" that would require

---

1. The court instructed as follows:

 In your deliberations, ladies and gentlemen, please understand that you must focus solely on finding the facts from the evidence in accordance with the instructions that I am giving to you. You must not consider or be concerned about the possible consequences of any verdict you may reach.

 With respect to that instruction, ladies and gentlemen, I must take note of a point that Mr. Wright made to you in his closing argument. Mr. Wright said to you and I believe this is an accurate quote: "If this is your idea of no crime of acceptable behavior, then I can say it to you, we are in tough shape." That was inappropriate argument, ladies and gentlemen, and therefore I am instructing you to disregard it.

us to reverse the trial court's denial of the defendants' motions for mistrials. The trial court did not abuse its discretion.

### B. Unpreserved Allegations of Error

For the first time on appeal the defendants catalog 40 remarks by the State that they argue are inappropriate and that rendered the trial unfair. The errors, if any, were not obvious. *State v. True*, 438 A.2d 460, 467 (Me.1981). *See State v. Tripp*, 634 A.2d 1318, 1320 (Me.1994).

### IV. Sufficiency of the Evidence

Bennett contends that there was insufficient evidence to convict him either as an accomplice or as a principal of criminally negligent manslaughter. He argues that Maldonado propelled Toler into the window causing his death and that there is no evidence he solicited or aided Maldonado in the commission of that act, or that Toler's death was a reasonably foreseeable consequence of Bennett's involvement in the fight. We disagree.

■■■■ "A person is guilty of manslaughter if that person ... [r]ecklessly, or with criminal negligence, causes the death of another human being...." 17–A M.R.S.A. § 203(1)(A) (Supp.1994). The elements of the offense are that

> (1) the defendant acted recklessly, by consciously disregarding a risk, or acted with criminal negligence by failing to be aware of a risk that his conduct could cause the death of another; (2) this disregard or failure to be aware of a risk rises to a gross deviation from the standard of conduct that a reasonable and prudent person would observe in the same situation; and (3) the defendant's reckless or criminally negligent conduct caused a death.

*State v. Gammon*, 529 A.2d 813, 815 (Me. 1987). A person is guilty as an accomplice of another person in the commission of a crime if:

> With the intent of promoting or facilitating the commission of the crime, he solicits such other person to commit the crime, or aids or agrees to aid or attempts to aid such other person in planning or committing the crime. A person is an accomplice under this subsection to any crime the

commission of which was a reasonably foreseeable consequence of his conduct....

17–A M.R.S.A. § 57(3)(A) (1983). "So long as the accomplice intended to promote the primary crime, and the commission of the secondary crime was a foreseeable consequence of the accomplice's participation in the primary crime, no further evidence of the accomplice's subjective state of mind as to the secondary crime is required." *State v. Linscott*, 520 A.2d 1067, 1070 (Me.1987). Accomplice accountability to manslaughter arises when some set of circumstances constituting manslaughter is a reasonably foreseeable consequence of the intended conduct. *Cf. State v. Kimball*, 424 A.2d 684, 694 (Me. 1981) (involving planned robbery that resulted in murder by uncontemplated means). It is without legal significance that the actual death "was constituted by different circumstances which, fairly regarded, are neither freakish nor outlandish relative to the foreseeable consequences." *Id.*

■■■■ In examining the sufficiency of the evidence, we view the evidence in the light most favorable to the State to determine whether a trier of fact "rationally could find beyond a reasonable doubt every element of the offense charged." *State v. Barry*, 495 A.2d 825, 826 (Me.1985). Pursuant to the rationales of *Linscott* and *Kimball*, once death is established as a foreseeable consequence of the primary crime (assault), Bennett becomes an accomplice to manslaughter as long as the circumstances of the death, fairly regarded, are "neither freakish nor outlandish relative to the foreseeable consequences." *See Kimball*, 424 A.2d at 694.

On the evidence before it the jury rationally could conclude that Bennett was an accomplice to manslaughter. Accordingly, we need not address whether there was sufficient evidence on which to convict Bennett as a principal of manslaughter.

The entry is:

Judgments affirmed.

All concurring.