**. STATE of Maine**

v.

**Richrd F. BLEYL, David E. Chamberlain
and Mark V. Coyne.**

Supreme Judicial Court of Maine.

Argued March 16, 1981.

Decided Sept. 29, 1981.

Wayne S. Moss (orally), Charles K. Leadbetter, Herbert Bunker, Asst. Attys. Gen., Augusta, for plaintiff.

E. James Burke (orally), Lewiston, for David E. Chamberlain.

Ayer & Hodsdon, Stephen Y. Hodsdon (orally), Kennebunk, for Mark Coyne.

Skelton, Taintor & Abbott, P.A., John B. Cole (orally), Lewiston, for Richard F. Bleyl.

Before McKUSICK, C. J., GODFREY, NICHOLS, GLASSMAN * and CARTER, JJ., and DUFRESNE, A. R. J.

GODFREY, Justice.

Alleging that various constitutional and evidentiary errors were committed at their joint trial, Richard Bleyl, David Chamberlain and Mark Coyne have brought this consolidated appeal from judgments of conviction for manslaughter, 17–A M.R.S.A. § 203(1)(A), burglary, 17–A M.R.S.A. § 401(2)(B), and robbery, 17–A M.R.S.A. § 651(1)(C), entered in the Superior Court, Androscoggin County. We affirm the judgments of conviction of manslaughter, burglary and robbery of the defendants Chamberlain and Coyne. We affirm the judgment of conviction of burglary of the defendant Bleyl but vacate the judgments of conviction for manslaughter and robbery against Bleyl.

On October 28, 1979, Annesie Goulet, an elderly woman who owned and lived in an apartment house in Lewiston, was found lying dead on a bed in her apartment. Her hands and feet were bound, her mouth was stuffed with facial tissue held in place by a nylon stocking used as a gag, and an apron covered her face. An autopsy revealed that she had died from asphyxiation. Her purse was found next to the bed. Bureau drawers in the apartment were open and jumbled, and various containers were found strewn on the bed with their lids off.

Local and state police began investigating Miss Goulet's death by interviewing her present and former tenants. Former tenants Matilda Shaw and David E. Chamberlain, alias, "David Shaw," were discovered to be living at that time in Dover, New Hampshire. After telephoning Dover police, Maine police detectives Ouellette and Cram traveled to New Hampshire on November 1 for the purpose of interviewing the Shaws. Two Dover detectives and the two Maine detectives arrived at the Shaw apartment in the late afternoon and were admitted by Matilda Shaw. Soon after the detectives entered the apartment, Chamberlain, who lived with Matilda Shaw, arrived. At the request of police, Chamberlain agreed to go to the Dover police station to answer some questions about his former landlady. During the course of his interrogation by Detective Ouellette, Chamberlain admitted his involvement in Annesie Goulet's death. He also implicated Richard Bleyl and Mark Coyne in the criminal activities of October 27.

Chamberlain told Detective Ouellette that he, Bleyl and Coyne, with two other men not parties to this appeal, had driven to Lewiston from Somersworth, New Hampshire, with the object of taking some money from the Goulet apartment. They arrived in Lewiston at about 9:00 p. m. and drank beer in several bars before driving to the Goulet apartment building. According to Chamberlain's account, Chamberlain, Bleyl and Coyne entered the apartment through an unlocked door and went into the bedroom. As Chamberlain picked up Miss Goulet's purse, she awoke. According to Chamberlain, Coyne and Bleyl bound and gagged the struggling woman. After rifling some drawers in the apartment, the three men left, rejoined their companions in the car and drove back to New Hampshire. At some point the five men divided sixty-eight dollars taken from Goulet's apartment.

Captain Rowe of the Dover Police Department formally arrested Chamberlain at about 8:00 p. m. On the basis of Chamberlain's statements, which were fully consistent with Ouellette's prior knowledge of the scene of the crime, Ouellette wrote an affidavit to the effect that he, Ouellette, was investigating a homicide and that David

---

* GLASSMAN, J., sat at oral argument and in the initial conference but died prior to adoption of this opinion.

Chamberlain had made a statement "as to his involvement, that of Mark Coyne ... and Richard Beyle (sic) all of New Hampshire." Ouellette swore to this affidavit before Captain Rowe. Rowe then prepared fugitive-from-justice complaints and warrants against the men implicated by Chamberlain. Rowe took those documents to a justice of the peace, who issued the warrants. The defendants have questioned the validity of those warrants, and the State has argued the constitutional issues presented in their case on the assumption, *arguendo*, that the warrants were defective. We make the same assumption. In any event, the record leaves no doubt that the police acted with a good faith belief that the warrants were valid.

Armed with the warrants, Captain Rowe, Detective Cram and two Somersworth, New Hampshire, police officers drove to Mark Coyne's apartment in Somersworth. Mark Coyne's wife let them inside, where they found and arrested Coyne and Richard Bleyl. *Miranda* warnings were given to Coyne and Bleyl at the time of their arrest.[1] Police conducted no questioning until after giving the two men further *Miranda* warnings at the Dover police station. Both Coyne and Bleyl signed waiver-of-rights forms and made statements implicating themselves in the Goulet matter.

After extradition to Maine, the three defendants were indicted by an Androscoggin County grand jury for murder, robbery and burglary. The three were tried jointly; the out-of-court statements of all three were admitted through the testimony of police officers. None of the defendants testified. Each was convicted of manslaughter, burglary and robbery. From judgments entered on the verdicts, Chamberlain, Coyne and Bleyl have brought the present appeal.

All three defendants have raised arguments that the presiding justice erroneously refused, before trial, to suppress their out-of-court statements regarding the events in Lewiston. All three claim that police viola-

tions of their constitutional rights under the fourth, fifth and sixth amendments required the exclusion from evidence of statements they gave to officers on November 1. Because Chamberlain's interrogation and arrest came about in different circumstances from Coyne's and Bleyl's, we shall first address Chamberlain's arguments, then treat Coyne's and Bleyl's jointly.

## I.

In the late afternoon of November 1, David Chamberlain arrived at his Dover apartment and entered it to find four plainclothes detectives, his common-law wife, his three children, and Richard Bleyl. In light of the fact that there were "so many people in the apartment," Detective Ouellette asked Chamberlain "if he would mind coming to the Dover police station ... to answer some questions, and help ... out as far as knowing any past things from Miss Goulet."[2] Ouellette's notes regarding the incident stated that Chamberlain said he would be glad to come, and "he would help ... in any way that he could." Chamberlain and two of the detectives then departed for the police station in an unmarked police car.

In the Dover police station, Ouellette and Chamberlain talked in a small interview room for some time, the conversation centering initially on Chamberlain's relationship with Annesie Goulet at the time he was her tenant. Chamberlain told Ouellette that he had been in Lewiston on October 27, having gone there with Coyne and Bleyl to make a drug deal. Ouellette shifted the conversation back to the Goulet death, telling Chamberlain that police were going to run polygraph tests on other tenants of Miss Goulet and inquiring whether Chamberlain would be willing to take such a test. Chamberlain told Ouellette he would want to see a lawyer before taking a polygraph test because he had once been "set up" on a drug deal.

---

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. Testimony quoted in this opinion has been excerpted from the trial transcript or from the transcript of the pretrial suppression hearing.

Ouellette told Chamberlain he was not interested in drugs but only in what had happened to Annesie Goulet. At that point Chamberlain began to cry and said he didn't want to go back to jail. "He would miss the kids, and had been to jail before, and couldn't stand not seeing the kids." Ouellette then asked Chamberlain if he wanted to make a phone call. While Ouellette listened, Chamberlain called Matilda Shaw (referred to at the trial as his common-law wife) and told her he would probably have to go back to Maine and asked her whether she would "wait for him."

Ouellette's testimony at the suppression hearing provides the best description of the next events:

> [PROSECUTOR]: After he finished his phone call, what happened?
>
> OUELLETTE: We went back into the interview room and sat down briefly.
>
> [PROSECUTOR]: What did you talk about then?
>
> OUELLETTE: At that time I told David—see he was physically upset, and I told him that he was very close to his children. We had a conversation in regard to what the effects would be on the children. I told him I understood how he felt if there was a possibility of him not being able to see his children, and I told Mr. Chamberlain that I, myself, have two children that I don't get a chance to see very often, and I understood how he felt but that on the other hand if something really bothered him, the only ones that would ever get the worse [sic] end of the deal would be the children because if something was really upsetting him that anything that would come up between he and the kids a lot of times probably would take it out on the kids, and sometimes it was a lot worse to live with someone like that. I then asked if he would come out to the officers' lounge area in the rear of the building.
>
> [PROSECUTOR]: Did he say anything at this time?
>
> OUELLETTE: No sir. It was not until we got to the rear lounge area—we got to the lounge area, and I asked Mr. Chamberlain if he wished to make another phone call, and he said no.
>
> [PROSECUTOR]: Did he say anything at that point?
>
> OUELLETTE: Yes.
>
> [PROSECUTOR]: What time of night is this?
>
> OUELLETTE: Approximately seven o'clock.
>
> [PROSECUTOR]: And you went back and said he didn't want to make a phone call?
>
> OUELLETTE: He said, no.
>
> [PROSECUTOR]: What did he do at that point?
>
> OUELLETTE: As we were going into the room, there was a large table back there, and I told David that he could sit right there. At this time David began to cry, and he told myself and also Detective Cram who was presently in the back, that what he told me in the interview room in regard to the drug deal was all a lie, and at that point Detective Cram, who was there, told me, said Maurice why don't you advise him of his rights at this time. I used a form, a sheet which was there at the Dover Police Department which I read off the sheet.
>
> [PROSECUTOR]: Have you got a copy of that?
>
> OUELLETTE: Yes, I have it right here, sir.
>
> THE COURT: At what point did you suspect him being involved in this homicide?
>
> OUELLETTE: When he called Miss Shaw, and told her that he would probably have to go back to Maine, and that he wanted to know how the children were, and he wanted to know if she would be willing to wait for him, and his emotional state at that time, the fact that he was crying and everything, I felt at that time he definitely had something other to tell me.
>
> THE COURT: He gave no statements after that?
>
> OUELLETTE: No, sir, he did not.

THE COURT: Till the *Miranda* rights were given?

OUELLETTE: That's correct.

Chamberlain was read his *Miranda* rights one at a time and asked if he understood each. He replied affirmatively and said he wanted to talk without an attorney present. He first gave an oral account of the events in Lewiston and subsequently signed a written statement. At the end of the suppression hearing the presiding justice ruled:

This Court determines with respect to the motion of defendant David Chamberlain that the interrogation circumstances of this case is not custodial interrogation, and therefore the motion to suppress is denied.

I determined that the defendant did voluntarily go with the police officer to the police station, and obviously he was free to go and free to leave, and the officers did not require him to remain in the police station up until the time he started to make what appeared to be an incriminating situation. He was not subject to a custodial interrogation, as soon as it did start to indicate that the *Miranda* warnings were given, and his rights were not violated.

██ Chamberlain contests the validity of this ruling and the subsequent admission at trial of his statements[3] on two grounds: first, that his presence at the Dover police station was brought about by an illegal seizure of his person in violation of his fourth amendment rights so that his subsequent statement, as a product of the illegal seizure, should have been suppressed, *see Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), and, second, that his confession was obtained from him against his will and in violation of *Miranda* and should have been suppressed. *See Miranda v. Arizona, supra.*

██ In *Dunaway, supra,* the Supreme Court held that statements made by a defendant seized without probable cause and subjected to a custodial questioning cannot

be used against him at trial unless the prosecution can show that the causal connection between the illegal seizure and any subsequent statement was attenuated to the point that the defendant's act in making the statement was "sufficiently an act of free will to purge the primary taint of the unlawful invasion" that constituted the fourth amendment violation. *Dunaway v. New York, supra,* 442 U.S. at 216–17, 99 S.Ct. at 2258–2259. *See also Brown v. Illinois,* 422 U.S. 590, 597, 95 S.Ct. 2254, 2258, 45 L.Ed.2d 416 (1975); *Wong Sun v. United States,* 371 U.S. 471, 486, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963). A person is seized only when an officer "by means of physical force or show of authority has in some way restrained [his] liberty." *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968), *quoted in United States v. Mendenhall,* 446 U.S. 544, 552, 100 S.Ct. 1870, 1876, 64 L.Ed.2d 497 (1980). No seizure occurs when a person goes "voluntarily [with police] in a spirit of apparent cooperation with the officer's investigation." *Sibron v. New York,* 392 U.S. 40, 63, 88 S.Ct. 1889, 1903, 20 L.Ed.2d 917 (1968), *quoted in United States v. Mendenhall, supra,* 446 U.S. at 553, 100 S.Ct. at 1876. The question whether a person's consent to accompany police officers is a product of duress or coercion, express or implied, is to be determined by the totality of the circumstances, *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973), and is a matter which the government has the burden of proving. *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968).

██ In ruling that David Chamberlain had gone "voluntarily" to the police station, the presiding justice correctly applied the principles of the fourth amendment, as articulated by the Supreme Court. The plainclothes officers at Chamberlain's apartment made no show of force by what they said or

---

**3.** The giving of *Miranda* warnings does not, in and of itself, purge the taint of a prior seizure of the person in violation of the fourth amend-

ment. *Brown v. Illinois,* 422 U.S. 590, 603, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975).

did,[4] and Chamberlain stated plainly that he would be "glad" to go to the police station and "help" the officers. Although we recognize that a request to come to the police station "may easily carry an implication of obligation, while the appearance itself, unless clearly stated to be voluntary, may be an awesome experience for the ordinary citizen," *Dunaway v. New York, supra,* 442 U.S. at 207 n.6, 99 S.Ct. at 2253 n.6, quoting the tentative draft of the Model Code of Pre-Arraignment Procedure, the record contains no evidence that officers restrained or coerced Chamberlain in any way. The request to go to the police station, without more, did not deprive him of his freedom. *See United States v. Mendenhall, supra.* Chamberlain's presence at the police station was not the result of an illegal seizure, and thus no violation of his fourth amendment rights required the presiding justice to suppress his later statements.

 We find no error in the presiding justice's conclusion that Chamberlain suffered no violation of his fifth amendment rights requiring suppression of his confession. The justice found, first, that Chamberlain's statements were voluntary, *see State v. Collins,* Me., 297 A.2d 620 (1972), and, second, that no custodial interrogation[5] of Chamberlain was conducted before his receipt of *Miranda* warnings. It is apparent from the presiding justice's use of the word "voluntary"[6] that he was applying the *Collins* standard of proof beyond a reasonable doubt to find that Chamberlain

had suffered no due process violation during interrogation, *see State v. Collins, supra; State v. Theriault,* Me., 425 A.2d 986, 988 n.2 (1981), and to find that, after receiving *Miranda* warnings, Chamberlain had understood and willingly waived the fifth amendment rights guarded by the prophylactic rules of *Miranda. See State v. Gordon,* Me., 387 A.2d 611, 612 (1978).

 The presiding justice's ruling did not specify what burden the State bore to disprove the existence of custody and, hence, to demonstrate that *Miranda* warnings were not required at the beginning of Chamberlain's interrogation or at any time before they were in fact administered. The question of the appropriate burden of proof to be applied to findings of the preliminary factors triggering the need for *Miranda* warnings is one never decided by this Court and one specifically left open in our recent opinion in *State v. Thurlow,* Me., 434 A.2d 1 (1981). Certain statements in *State v. Collins* have sometimes been regarded as requiring application of the highest standard of proof to preliminary *Miranda* questions. *See State v. Thurlow, supra.* No ruling by this Court has required such an application. Although this Court accepted in *Collins* the Supreme Court's invitation in *Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972), to require the state to prove by the highest standard of proof that a criminal defendant's privilege against self-incrimination, as embodied in the Maine Constitution, has not been violated, this Court has never decided that the

---

4. In *United States v. Mendenhall,* the Supreme Court cited, as examples of circumstances that might indicate a seizure, ". . . the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." 446 U.S. at 554, 100 S.Ct. at 1877.

5. The State conceded that Chamberlain was under interrogation throughout his contact with police. The State argued, however, and the presiding justice agreed, that Chamberlain was not in custody. A defendant must be both under interrogation and in custody for *Miranda* warnings to be requisite. *See Rhode Island v.*

*Innis,* 446 U.S. 291, 299-300, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980).

6. The presiding justice reiterated this finding at trial, over renewed objections by Chamberlain's counsel to admission of Chamberlain's confession:

[I]f I didn't make it clear on the motion to suppress, I'm ruling that the confession of David Chamberlain, to make it unmistakably clear as the Law Court has used that term, I find that to be a voluntary statement without any further findings of fact. So the motion to suppress was denied because the Court determined that this was a voluntary statement on his part.

Maine Constitution requires *Miranda* warnings to be administered to a person undergoing custodial interrogation under penalty of exclusion of the evidence if they are not. Whether the police have complied with *Miranda's* mandates is a matter of federal constitutional law, and the determination of whether *Miranda* is applicable in a given situation is governed by the federal standard of proof by a preponderance. *See Lego v. Twomey, supra,* 404 U.S. at 489, 92 S.Ct. at 626.

██ Review by this Court of the presiding justice's rulings regarding the admissibility of David Chamberlain's statements proceeds on the basis that the presiding justice will be sustained if, "in accordance with the correct legal principle specifying the ultimate burden and requisite cogency of proof", the evidence in the record provides rational support for the conclusions he reached. *State v. Collins, supra,* 297 A.2d at 625.

The record before us reveals "with unmistakable clarity", *see Mincey v. Arizona, supra,* 437 U.S. 385 at 397 n.12, 98 S.Ct. 2408 at 2416 n.12, 57 L.Ed.2d 290, that in the totality of the circumstances Chamberlain's statements to Detective Ouellette were the product of his free will and were voluntary within the meaning of the due process clauses of the fifth and fourteenth amendments. *See Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); *State v. Melvin,* Me., 390 A.2d 1024 (1978).

 The record similarly provides rational support for the presiding justice's determination that Chamberlain was not in custody when he made his initial, arguably incriminating statement to Detective Ouellette and for the justice's implicit finding that Chamberlain knowingly, intelligently and voluntarily waived his fifth amendment rights after receiving *Miranda* warnings. When faced with deciding whether *Miranda* warnings should have been given to a person who later argues a violation of *Miranda* rules, the presiding justice should examine the facts of the particular case to determine whether the line between general investigation and custodial interrogation has been crossed by police. *State v. Inman,* Me., 350 A.2d 582, 597–98 (1976). A person is in custody for the purposes of *Miranda* only when he is deprived of his freedom in some significant way or would be led, as a reasonable person, to believe he was not free to leave the presence of police. *State v. Thurlow, supra; State v. Preston,* Me., 411 A.2d 402 (1980); *State v. Inman, supra. See also United States v. Hall,* 421 F.2d 540 (2d Cir. 1969); *People v. Harris,* 48 N.Y.2d 208, 215, 397 N.E.2d 733, 736, 422 N.Y.S.2d 43, 45 (1979) ("a reasonable person, innocent of any crime").

 Factors bearing on a person's deprivation of freedom include the following: where the questioning occurred, whether police attention has focused on him as a suspect, whether police imposed restraint on him at the time of questioning, and whether he was subjected to questioning incommunicado in a police-dominated atmosphere. *State v. Inman, supra,* 350 A.2d at 598. The fact that a person is questioned at a police station will not necessarily give rise to the need for *Miranda* warnings. If he goes voluntarily to a station house, he is not, in the absence of facts showing restraint on his freedom, in custody for purposes of *Miranda. Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) ("coercive environment" not equivalent to custody). Similarly, focus by the police on the individual as a suspect in a crime does not, in itself, produce restraint equivalent to custody. *Beckwith v. United States,* 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976).

██ As we found in treating Chamberlain's fourth amendment claims, David Chamberlain went voluntarily to the Dover station house to "help" officers in the investigation of Annesie Goulet's death. Officers did not coerce or restrain him in any way, and, although he was not told in so many words that he was free to leave, *cf. Oregon v. Mathiason, supra,* the trial justice could have rationally concluded that a reasonable man in Chamberlain's position would not have felt deprived of his liberty.

See State v. Thurlow, supra; State v. Inman, supra. See also Quick v. State, 599 P.2d 712, 717 (Alaska 1979).

Detective Ouellette's initial interrogation of Chamberlain was of a general investigatory nature and became more acutely directed toward the immediate circumstances of the crime itself only after Chamberlain had made the telephone call to Matilda Shaw. Ouellette admitted that his suspicions had focused on Chamberlain as a potential suspect after that telephone call. See Beckwith v. United States, supra. However, at no time did officers physically restrain Chamberlain or make any show of force. Statements Chamberlain had made to Ouellette, while ambiguously incriminating, in no way directly implicated him in Annesie Goulet's death. A reasonable man in Chamberlain's position would not have felt that he had "let the cat out of the bag"[7] to the extent that he would be restrained from leaving thereafter.

The Supreme Court's cautionary words in Oregon v. Mathiason, supra, are relevant to our role as an appellate court reviewing a presiding justice's findings that the factual circumstances here did not add up to custody:

Such a noncustodial situation is not converted to one in which Miranda applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was that sort of coercive environment to which Miranda by its terms was made applicable, and to which it is limited. Oregon v. Mathiason, supra at 495, 97 S.Ct. at 714.

We conclude that the record supports the presiding justice's determination that Chamberlain had not been in custody, as having been made rationally on the basis of a preponderance of the evidence. He did not err in refusing to suppress statements made by Chamberlain before Miranda warnings were given.

Because the record also supports a finding that Chamberlain subsequently received complete Miranda warnings and that, beyond a reasonable doubt, he chose intelligently and voluntarily to waive the fifth and fourteenth amendment rights Miranda is supposed to protect, his oral and written confessions were admissible against him at trial.[8] The presiding justice committed no error in refusing to suppress them.

7. See United States v. Bayer, 331 U.S. 532, 540-41, 67 S.Ct. 1394, 1398, 91 L.Ed. 1654 (1947):

Of course, after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession always may be looked upon as fruit of the first. But this Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed.

8. Chamberlain's subsidiary argument that he was denied access to an attorney is meritless. Early in the interview with Ouellette, Chamberlain said he would want an attorney before taking a polygraph examination because he had once been "set up" on a drug deal. That statement was not a request for the presence of an attorney during his interrogation by Ouellette. See State v. Catlin, Me., 392 A.2d 27, 31 (1978). In any event, Chamberlain was not under indictment or arrest or in custody at the time he mentioned an attorney; he suffered no fifth or sixth amendment violation.

## II.

▮ David Chamberlain's codefendants, Mark Coyne and Richard Bleyl, too have argued that their rights under the fourth and fifth amendments were violated by their arrests and interrogations. As appears from the facts pertinent to the issuance of the warrants used by Captain Rowe to arrest Coyne and Bleyl, Dover Magistrate Edgar Bois issued fugitive-from-justice warrants for the two men without reading Detective Ouellette's sworn affidavit and without hearing sworn statements from either Ouellette or Rowe regarding Chamberlain's confession and the crimes committed in Lewiston. The presiding justice concluded that the arrests of Coyne and Bleyl were "lawful and legal." Because the warrant clause of the fourth amendment requires that no warrant shall issue except upon probable cause supported by oath or affirmation, and because that clause requires that probable cause be determined by a neutral and detached magistrate, we conclude that Coyne and Bleyl were arrested in violation of their fourth and fourteenth amendment rights.[9] *See Coolidge v. New Hampshire*, 403 U.S. 443, 449, 91 S.Ct. 2022, 2029, 29 L.Ed.2d 564 (1971); *Johnson v. United States*, 333 U.S. 10, 13–14, 68 S.Ct. 367, 368–69, 92 L.Ed. 436 (1948). *See also* 1 & 2 W. Ringel, *Searches and Seizures, Arrests and Confessions* §§ 4.1 *et seq.*, 5.3, 23.5, 23.6 (1980). We conclude also, however, for reasons stated below, that the initial illegality of the arrests did not require suppression of statements made later by Coyne and Bleyl in the Dover station house. *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *State v. Turner*, Me., 394 A.2d 798 (1978). *See also State v. Ann Marie C.,* Me., 407 A.2d 715 (1979).

▮ In *Brown v. Illinois, supra,* the United States Supreme Court provided a framework for determining when the arrest of a defendant in violation of the fourth amendment would not require suppression of his subsequent statements as "fruit" of the initial illegality. *See Wong Sun v. United States, supra.* The admissibility of statements made after an illegal arrest must be determined, on the facts of the particular case, in light of (1) the voluntariness of the defendant's statements (a threshold requirement), (2) police compliance with *Miranda*, (3) the closeness in time of the arrest and statement, (4) the presence of intervening circumstances, and (5) in particular, the purpose and flagrancy of the police misconduct. 422 U.S. at 602–604, 95 S.Ct. at 2261–62; *see State v. Turner, supra,* 394 A.2d at 800.

▮ In any case, finding a violation of the defendant's fifth amendment rights would obviate the need to consider whether any circumstance purged the taint of the fourth amendment violation. *Dunaway v. New York, supra* 442 U.S. at 217, 99 S.Ct. at 2258. If the defendant's statement was involuntary or obtained in violation of *Miranda*, the fifth amendment itself requires exclusion of his statements.

Coyne suffered no due process or *Miranda* violation. Bleyl, however, contends that he was confused and under the influence of drugs at the time of his interrogation, hence that his statement was not the product of his free will and that he was unable to waive effectively the rights protected by *Miranda*.

▮ The fact that a person being interrogated in custody is under the influence of drugs does not, in itself, render a confession involuntary. *State v. Gordon*, Me., 387 A.2d 611, 612 (1978). The particular circumstances of each case must be eval-

---

9. Apparently the arrests of Coyne and Bleyl also violated New Hampshire statutory law. *See* N.H.Rev.Stat.Ann., §§ 612:1 *et seq.*, especially 612:13, 612:14. Because the defendants base their claim that subsequently acquired evidence should have been excluded from trial by the exclusionary rule implementing the fourth amendment of the Federal Constitution, we need not address the State law problem.

The State has conceded that Coyne's and Bleyl's arrests cannot be justified as warrantless arrests, and we agree.

uated to determine whether a defendant's drug-related condition made him incapable of acting voluntarily, knowingly, and intelligently. *State v. Ashe*, Me., 425 A.2d 191, 194 (1981). The presiding justice found on the basis of testimony at the suppression hearing that Bleyl was "aware and able to comprehend with coherence and rationality" and "wanted to tell what he believed happened on this occasion." The record supports the justice's finding, beyond a reasonable doubt, that Bleyl's statement was the product of his free will. *See State v. Melvin, supra; State v. Collins, supra.*

▮ Bleyl testified at the suppression hearing that he could not remember whether he received complete *Miranda* warnings, and he implied that he had requested and been refused access to an attorney. The presiding justice found Bleyl's testimony regarding the facts of his interrogation to be "not credible" and accepted the testimony of Officer Cram. The record supports a finding that Bleyl did receive complete *Miranda* warnings twice before making any statement and that he intelligently and voluntarily waived his fifth amendment rights in agreeing to talk with police. *See State v. Gordon, supra.* After giving his statement, Bleyl made an ambiguous inquiry about an attorney but made no further statements thereafter. Later he did request the presence of an attorney, and the police then stopped questioning him. Bleyl suffered no due process or *Miranda* violations, *see Edwards v. Arizona*, —— U.S. ——, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and the presiding justice correctly refused to suppress his confession.

▮ Coyne's and Bleyl's statements were found to be voluntary beyond a reasonable doubt; the police complied with *Miranda*. Under *Brown v. Illinois*, analysis proceeds to consideration of other factors pertinent to the initial fourth amendment violation. Although Coyne and Bleyl made their statements shortly after their arrests, the record contains no evidence that officers exploited the arrests in obtaining the statements. Perhaps most importantly, the record reveals that the police conduct in

effecting the arrests was in no way purposefully or flagrantly illegal. *See State v. Turner, supra*, 394 A.2d at 800; *cf. Brown v. Illinois, supra*, 422 U.S. at 605, 95 S.Ct. at 2262. Captain Rowe had taken Detective Ouellette's sworn affidavit regarding Chamberlain's confession and the unlawful homicide of Annesie Goulet; Ouellette had heard Chamberlain's confession, a statement against his own penal interest, *see United States v. Harris*, 403 U.S. 573, 583–84, 91 S.Ct. 2075, 2081–82, 29 L.Ed.2d 723 (1971), which was fully consistent with facts ascertained by police during their investigation in Lewiston. Ouellette was available to provide sworn information to the Dover magistrate beyond what was contained in the affidavit. In fact, the police had probable cause to obtain warrants of arrest for Coyne and Bleyl. *See Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949) ("Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed. *Carroll v. United States*, 267 U.S. 132, 162 [45 S.Ct. 280, 288, 69 L.Ed. 543] (1925).")

Moreover, Captain Rowe believed, in good faith, that he had obtained valid warrants. Rowe had given Ouellette's affidavit to Magistrate Bois and believed that Bois had read it before issuing the warrants. Dover police communicated with Somersworth police, who had the legal authority to arrest Coyne in Somersworth. They went to Coyne's home, where they were admitted by Mrs. Coyne, and peaceably arrested Coyne and Bleyl, who was an overnight guest at Coyne's home.

Nothing in the conduct of the local New Hampshire officers or of Maine State Police officers manifested the kind of willful or purposeful misconduct that the exclusionary rule was fashioned to deter. *See Brown v. Illinois, supra; United States v. O'Looney*, 544 F.2d 385, 391 (9th Cir. 1976); *State v. Turner, supra*, 394 A.2d at 800.

The deterrent purposes of the fourth amendment, as implemented by the exclusionary rule, would not be served by excluding from evidence the voluntary statements of Coyne and Bleyl, made after arrests police had effected in good faith in attempted compliance with the law. Although the presiding justice erred in concluding that the arrests were lawful, Coyne's and Bleyl's statements were not required to be suppressed because of the illegality of those arrests; hence they were properly admitted at trial.

### III.

The foregoing analysis has addressed the question whether the confession of each of the three defendants was admissible against him at trial. All three defendants have alleged also errors arising out of the prosecution's use, at their joint trial, of the out-of-court statements of the other two. Bleyl contends that admission of Chamberlain's and Coyne's confessions violated his sixth amendment right to confront the witnesses against him, as construed in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). All three defendants contend that admission of the unredacted confessions of the other two violated M.R. Evid. 105 and resulted in prejudicial error requiring reversal of their confessions. Bleyl's arguments will be considered first.

In *Bruton*, the United States Supreme Court ruled that admission in evidence of a non-testifying codefendant's pretrial confession implicating the defendant violated the sixth amendment rights of the defendant even where the presiding justice gave instructions limiting the admissibility of the confession to the codefendant. *Bruton v. United States, supra*, 391 U.S. at 126, 88 S.Ct. at 1622, *overruling Delli Paoli v. United States*, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1952). Admission of such a confession was perceived as creating a "devastating" risk that the jury would dis-

regard the Court's instructions and convict the non-declarant defendant on the basis of hearsay evidence untested by cross-examination and inadmissible against him. *Bruton v. United States, supra*, 391 U.S. at 128–137, 88 S.Ct. at 1623–1628.

 In *Bruton*, the defendant asserting the sixth amendment violation had not himself made pretrial admissions or confessions. In *Parker v. Randolph*, 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979), the Supreme Court's most recent encounter with the *Bruton* problem, multiple defendants had all made out-of-court statements implicating themselves in a crime. The Court divided sharply regarding the applicability of *Bruton* in such a case. A four-justice plurality found that admission at a joint trial, with proper limiting instructions, of "interlocking confessions" made by codefendants did not infringe on a defendant's sixth amendment right of confrontation. The rationale of the plurality was that "[t]he right protected by *Bruton* —the 'constitutional right of cross-examination' . . . has far less practical value to a defendant who has confessed to the crime than to one who has consistently maintained his innocence." *Parker v. Randolph, supra*, 442 U.S. at 73, 99 S.Ct. 2139. "Interlocking confessions" preclude the "devastating" risk of jury confusion and prejudice presented in a joint trial where the jury must keep separate a confession admissible against one codefendant but inadmissible against another. *Id.* In other words, the defendant convicts himself "by heaping blame onto himself," *id.*, minimizing the possibility that the untested hearsay of his codefendants affects the jury's decision, with the result that the *Bruton* rule becomes inapplicable.[10]

The deciding vote in *Parker v. Randolph* was cast by Justice Blackmun, who rejected a *per se* "interlocking-confessions" exception to *Bruton* and advocated continued adherence to the "harmless error" standard of

---

**10.** The rule of *Parker v. Randolph* permitting admission of interlocking confessions does not eliminate the need for instructions to the jury directing it to limit its consideration of each confession to the defendant who made it. The confession of each codefendant is admissible only against him and is inadmissible hearsay as to other defendants as a matter of state law. *See* M.R.Evid. 105, 802, 804(b)(3).

*Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). In *Harrington,* the defendant had made a statement placing himself at the scene of the crime; that statement, coupled with other, "overwhelming" incriminating evidence (including the testimony of eyewitnesses) rendered the *Bruton* violation effected by admission of the non-testifying codefendants' confessions harmless beyond a reasonable doubt. *Id.* at 254, 89 S.Ct. at 1728. *See also Brown v. United States,* 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973); *Schneble v. Florida,* 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972); *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Thus, in Justice Blackmun's view, *Bruton* applied to admission of multiple pretrial confessions, but a *Bruton* violation could be harmless error if, on the facts of the particular case, the error did not contribute to the defendant's conviction. *See Chapman v. California, supra.* Justice Blackmun found the *Bruton* error in *Parker v. Randolph* to be harmless. The remaining three justices dissented, agreeing with Justice Blackmun on the "harmless-error" standard but finding it to be unsatisfied on the facts of the case.

Even before *Parker v. Randolph* was announced, the Second Circuit regarded "interlocking confessions" as outside the *Bruton* rule. *See United States ex rel. Ortiz v. Fritz,* 476 F.2d 37, 38 (2d Cir.), *cert. denied,* 414 U.S. 1075, 94 S.Ct. 591, 38 L.Ed.2d 482 (1973); *United States ex rel. Catanzaro v. Mancusi,* 404 F.2d 296 (2d Cir. 1968), *cert. denied,* 397 U.S. 942, 90 S.Ct. 956, 25 L.Ed.2d 123 (1970). However, because the Supreme Court divided evenly on the issue, the doctrine of "interlocking confessions" as an exception to *Bruton* is not binding precedent. *See Neil v. Biggers,* 409 U.S. 188, 192, 93 S.Ct. 375, 378, 34 L.Ed.2d 401 (1972); *see also State v. Rodriquez,* 226 Kan. 558, 601 P.2d 686, 690 (1979). Since *Parker v. Randolph,* at least two jurisdictions have rejected the *per se* exception and adhered to a harmless error standard. *State v. Ro-*

*driquez, supra; Quick v. State,* 599 P.2d 712, 723–24 (Alaska 1979). In *State v. Elwell,* Me., 380 A.2d 1016, 1021 n. 5 (1977), this Court noted its agreement with the Tenth Circuit in *Metropolis v. Turner,* 437 F.2d 207, 208 (10th Cir. 1971), that the distinction between no *Bruton* violation and a harmless violation where interlocking confessions were introduced at trial was a "legal nicety".

■ Although we perceive the deficiencies of the doctrine of interlocking confessions, especially in light of the Supreme Court's failure to define in *Parker v. Randolph* what it meant either by "confession"[11] or by "interlocking", we recognize that use of the doctrine provides the only analytical means for a trial justice to rule on a pretrial motion for severance where multiple defendants raise *Bruton* arguments based on the prosecution's prospective use of multiple extrajudicial statements. *See* M.R.Crim.P. 14. A trial justice can hardly sanction, before trial, commission of a constitutional error on the theory that it will be "harmless" in light of all of the evidence. Prosecutors should be cautious about pressing for joinder of multiple defendants where, as in the present case, multiple extrajudicial statements raise serious constitutional questions. In such a situation insistence on joinder may prove ill-advised and ultimately wasteful of the judicial resources joinder was designed to conserve. *See State v. Anderson,* Me., 409 A.2d 1290 (1979). *Parker v. Randolph* did not overrule *Bruton* ; the doctrine of interlocking confessions does not provide an alternative to severance where a defendant faces a serious risk of prejudice from admission of a confession by one of his codefendants.

In the instant case, the presiding justice ruled that Chamberlain, Coyne and Bleyl could be tried together and that the confessions of all three could be admitted because the confessions "interlocked". Chamberlain's and Coyne's confessions implicated

11. The Supreme Court has described a "strict confession" as a "complete and conscious admission of guilt." *Opper v. United States,* 348 U.S. 84, 91, 75 S.Ct. 158, 163, 99 L.Ed. 101 (1954).

both of them and Bleyl in conduct constituting burglary, robbery and manslaughter. Bleyl's own confession, however, implicated him only in conduct constituting burglary. The presiding justice refused to sever Bleyl's case, although it was clear that Chamberlain's and Coyne's confessions went far beyond Bleyl's in implicating Bleyl in the unlawful killing of Annesie Goulet and in the forcible taking of money from her. *Cf. United States v. Fleming,* 594 F.2d 598, 605 (7th Cir.), *cert. denied,* 442 U.S. 931, 99 S.Ct. 2863, 61 L.Ed.2d 299 (1979). The presiding justice theorized that Bleyl's confession "interlocked" with the other two on the basis of 17–A M.R.S.A. § 57(3)(A), the section of the Code defining criminal accomplice liability for the conduct of others. Section 57(3)(A) provides, in pertinent part:

> A person is an accomplice under this subsection to any crime the commission of which was a reasonably foreseeable consequence of his conduct . . . .

In other words, the presiding justice ruled, as a matter of law, that Bleyl's confession showed that manslaughter and robbery were foreseeable consequences of his admitted participation in the burglary of Miss Goulet's apartment. *Cf. State v. Kimball,* Me., 424 A.2d 684 (1981). For reasons set forth below, this ruling was an error requiring vacation of Bleyl's convictions for manslaughter and robbery. *Bruton v. United States, supra.*

As we noted above, the Supreme Court did not define what it meant by "interlocking confessions" in *Parker v. Randolph.* The sensible approach would be to regard "interlocking" confessions as being factually consistent and corroborative of one another. Although absolutely identical statements should not be required because "suspects questioned separately with each seeking to minimize his role" in the crime are unlikely to be "in precise accord in their recital of details," *Felton v. Harris,* 482 F.Supp. 448, 455 (S.D.N.Y.1979), the confessions, to "interlock", should be substantially similar and consistent on the major elements of the crime; in particular, the motive, plotting and execution of the crime. *Id.; accord, United States ex rel. Ortiz v.*

*Fritz, supra,* 476 F.2d at 39 (all confessions agreed on the conduct of the defendant asserting the *Bruton* violation). In order to interlock, multiple confessions should be "parallel" and should "dove-tail" with one another, *Metropolis v. Turner, supra,* 437 F.2d at 208, and be "substantially similar and corroborative of each other." *State v. Elwell, supra,* 380 A.2d at 1021.

If the "interlocking" analysis is used, a comparison of the three confessions shows that Bleyl's interlocks with and corroborates Chamberlain's and Coyne's on the crime of burglary, but does not do so at all on the crimes of manslaughter and robbery. This kind of problem was foreseen by Justice Blackmun in his separate opinion in *Parker v. Randolph* :

> The fact that confessions may interlock to some degree does not ensure, as a *per se* matter, that their admission will not prejudice a defendant so substantially that a limiting instruction will not be curative. The . . . confessions may interlock in part only. Or they may cover only a portion of the events in issue at the trial. Although two interlocking confessions may not be internally inconsistent, one may go far beyond the other in implicating the confessor's codefendant. In such circumstances, the admission of the confession of the codefendant who does not take the stand could very well serve to prejudice the defendant who is incriminated by the confession, notwithstanding that the defendant's own confession is, to an extent, interlocking. 442 U.S. at 79, 99 S.Ct. at 2142.

*See also State v. Rodriquez, supra* (reversible error to admit confession of codefendant implicating defendant in the homicide where defendant had confessed only to being at scene and helping to dispose of body).

Because Bleyl's confession did not "interlock" with Chamberlain's and Coyne's on the crimes of manslaughter and robbery, the presiding justice erred in ruling that the codefendants' confessions did not prejudice Bleyl on the basis that they interlocked with his. Bleyl's case presents a classic

*Bruton* problem of jury confusion. Could the jury, in this joint trial, have confined its consideration of Bleyl's guilt of manslaughter and robbery to the evidence properly admissible against him?[12] After the jury had heard the confessions of Chamberlain and Coyne, which described in detail Bleyl's direct participation in the binding and gagging of Annesie Goulet and in the division of the money taken from her apartment, it could not be expected to confine its deliberations on Bleyl's possible guilt of homicide and robbery to the issue of whether he was an accomplice in those crimes. The premise of the plurality in *Parker v. Randolph*, that the maker of an "interlocking" confession "heap[s] blame onto himself" and does not suffer the "devastating" risk of conviction on the basis of untested hearsay inadmissible against him does not apply in Bleyl's case as far as the charges of homicide and robbery are concerned.

Nor are we able to say, on all the evidence admitted at trial, that the *Bruton* violation of Bleyl's sixth amendment rights was a harmless error within the meaning of Justice Blackmun's concurrence in *Parker. See also Harrington v. California, supra; Schneble v. Florida, supra.* Aside from his confession, the only meaningful evidence admissible against Bleyl was a fingerprint "lifted" from a living room door jamb in Miss Goulet's apartment. That fingerprint implicated him no further than his own statement. No overwhelming evidence, independent of the confessions of Chamberlain and Coyne, lessened the prejudicial possibility that those two confessions contributed to Bleyl's conviction of manslaughter and robbery in a constitutionally impermissible manner. It is necessary to vacate Bleyl's convictions of manslaughter and robbery and remand the case for further proceedings on those charges.[13]

Our ruling on the manslaughter and robbery convictions, however, does not require us to vacate Bleyl's conviction of burglary on *Bruton* grounds. The burglary conviction does not suffer from the constitutional error tainting the other two convictions. Bleyl's confession did interlock with Chamberlain's and Coyne's regarding conduct amounting to burglary. His own confession, admissible against him, placed him illegally inside Annesie Goulet's apartment with the intention of committing theft. Any violation of Bleyl's sixth amendment rights arising out of admission of his codefendants' confessions was, at most, a harmless error in relation to the burglary conviction.

█ Although we do not retreat from our past position that, in general, joint trials are favored in the interests of conserving judicial resources, avoiding duplicative trials and promptly bringing accused persons to trial, *see State v. Anderson, supra,* 409 A.2d at 1297; *State v. Rich,* Me., 395 A.2d 1123, 1128 (1978),[14] it must be recognized that severance or some alternative means of guarding a defendant's sixth amendment rights, *see State v. Wing,* Me., 294 A.2d 418, 422 (1972), is required where *Bruton* violations can be foreseen clearly before trial.

12. *See Nash v. United States,* 54 F.2d 1006, 1007 (2d Cir. 1932) (L. Hand, J.):
 In effect, however, the rule [permitting admission of evidence, with limiting instructions, admissible against one defendant but not against another] probably furthers, rather than impedes, the search for truth, and this perhaps excuses the device which satisfies form while it violates substance: that is, the recommendation to the jury of a mental gymnastic which is beyond, not only their powers, but anybody's else.

13. We need intimate no opinion regarding whether, in a separate trial, Bleyl's own confession so far implicated him in the unlawful killing of Annesie Goulet and the robbery of her apartment that a jury instruction would be warranted regarding his possible liability as an accomplice in those crimes. *Cf. State v. Kimball, supra.* Nor do we mean to decide that a confession could never be ruled to interlock with others predicated on a defendant's potential liability as an accomplice. We decide only that, on the facts of this case, Bleyl incurred the "devastating" risk of being convicted for two serious crimes on the basis of his codefendants' confessions. It is precisely this risk that the *Bruton* rule was fashioned to preclude.

14. *See also United States v. Barber,* 442 F.2d 517, 529 (3d Cir.), *cert. denied,* 404 U.S. 958, 92 S.Ct. 327, 30 L.Ed.2d 275 (1971).

## IV.

■■ Although the defendants Chamberlain and Coyne have not raised *Bruton* arguments on this appeal, they have joined Bleyl in alleging that admission at trial of the unredacted confessions of their codefendants violated Maine Rule of Evidence 105. Rule 105 provides:

When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court upon request shall restrict the evidence to a proper scope and instruct the jury accordingly. In a criminal case tried to a jury evidence inadmissible as to one defendant shall not be admitted as to other defendants unless all references to the defendant or to whom it is inadmissible have been effectively deleted.

Because references to codefendants were not deleted from the confessions of each defendant, Rule 105 was violated on its face when each of the three confessions was admitted over the objections of counsel.[15] The question is whether a violation of Rule 105 requires reversal of a defendant's conviction independently of the constitutional principles that the rule implements.

The Adviser's Note to Rule 105 says that the second sentence of Rule 105, which has no counterpart in the Federal Rules of Evidence, "seems called for by proper respect for the *Bruton* rule." *See* R. Field and P. Murray, *Maine Evidence* (1976). That provision of Rule 105 should thus be understood as implementing *Bruton* and its progeny. Just as a *Bruton* violation may sometimes be harmless error, *see Parker v. Randolph, supra; Harrington v. California, supra,* so may a violation of Rule 105 be harmless on the facts of the particular case.

Chamberlain's and Coyne's confessions are substantially similar and corroborate each other. With respect to the burglary charges, Bleyl's confession also interlocks with the other two. Any *Bruton* violation that Chamberlain or Coyne suffered

through admission of the other unredacted confessions was harmless beyond a reasonable doubt. Similarly, the technical violation of Rule 105 suffered by either Chamberlain or Coyne, or by Bleyl with respect to the burglary charge, through admission of the other unredacted confessions was harmless. *See* M.R.Crim.P. 52(a).

With respect to the homicide and robbery charges, however, the Rule 105 violations in Bleyl's case can no more be treated as harmless than the *Bruton* violations that require vacation of his robbery and manslaughter convictions. The references to Bleyl's participation in those crimes contained in Chamberlain's and Coyne's confessions were highly prejudicial. On the same analysis, the facial violation of Rule 105 with regard to the burglary conviction was harmless, beyond a reasonable doubt, as prejudicing Bleyl no further than his own confession. On the facts of this case, neither harmless nor reversible error can be predicated on Rule 105 independently of the constitutional underpinnings of the rule in *Bruton* and its refinements.

## V.

■■■■ The next allegation of error raised by the defendant Coyne is based on the presiding justice's denial of Coyne's motion for a jury-waived trial. Maine Rule of Criminal Procedure 23(a) permits a defendant, "with the approval of the court," to waive a trial by jury. Permitting waiver is discretionary with the trial justice. The United States Constitution does not guarantee any right to a non-jury trial, *Singer v. United States,* 380 U.S. 24, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965), and we hold that the Maine Constitution does not either. Although the presiding justice's primary consideration in granting or refusing a criminal defendant a jury-waived trial must be whether "the defendant is knowingly and intelligently waiving his right with full awareness of the consequences," H. Glassman, 3 *Maine Practice* § 23.3 (1967), other

---

**15.** The presiding justice instructed the jury that each defendant's confession was admissible only against him.

factors should be weighed in his decision. In the instant case, the presiding justice had to consider Coyne's motion for a jury-waived trial in the light of factors favoring a joint trial of the three defendants. Because joinder is preferable when codefendants' constitutional rights are not endangered, *State v. Anderson, supra*, 409 A.2d at 1297, the trial justice could properly deny a motion for jury-waived trial where the effect of granting the motion would be to preempt the discretionary joinder provisions of M.R.Crim.P. 13 and 14. In so ruling, he acted within the permissible range of his discretion.

■ The presiding justice did not err in denying Coyne's motion for a jury-waived trial.

### VI.

All three defendants have joined in an argument that the presiding justice erred in admitting their confessions before the corpus delicti of the crime of robbery was established. The argument is without merit.

■ One of the requirements of the corpus delicti rule is that the State, before introducing a defendant's extrajudicial admissions of guilt, present sufficient credible evidence to support a substantial belief that the crime charged has been committed by someone. *State v. Anderson, supra*, 409 A.2d at 1300–01 (1979). The crime charged in the indictment was robbery (in this case the theft of money by force) in violation of 17–A. M.R.S.A. § 651(1)(C), which provides in pertinent part:

1. A person is guilty of robbery if he commits or attempts to commit theft and at the time of his actions:

. . . . .

C. He uses physical force on another with the intent enumerated in paragraph B . . .

In order to establish the corpus delicti of robbery under the indictment and under this statute, the State was bound to introduce sufficient credible evidence to support a substantial belief that someone had un-lawfully taken money by force from Annesie Goulet. *See* 17–A. M.R.S.A. §§ 352, 353. Neither the identity of the perpetrator nor his state of mind comprises an essential part of the corpus of the crime for the purpose of allowing subsequent admission of a defendant's extrajudicial confession; either of those elements may be proved by the defendant's own admissions. *State v. Anderson, supra*, 409 A.2d at 1301.

■ In the instant case, the State introduced evidence to show (1) that it was commonly known to Annesie Goulet's tenants that she kept cash in her apartment, (2) that her dead body was found bound and gagged on her bed, and, (3) that her apartment was in disarray, with drawers opened, empty candy tins lying on the bed with their lids off, her purse lying on the floor, and the apartment door partially open. That evidence sufficed to establish a substantial belief that money had been forcibly taken from Annesie Goulet and to permit subsequent introduction of the confessions of the defendants.

■ The policy behind the corpus delicti rule is to avoid the possibility that someone will be convicted of a crime when in fact no crime was committed. *State v. Anderson, supra*, 409 A.2d at 1300; *State v. Grant*, Me., 284 A.2d 674, 675 (1971). The standard for establishment of the corpus delicti is not that of proof that the named defendant, beyond a reasonable doubt, committed the crime charged by the indictment; that standard is required to be met by the total evidence, of which the defendant's own confession is a properly considered part. Before the State introduced the defendants' confessions in the instant case, it had adduced evidence sufficient to support a substantial belief that a robbery by someone had taken place. The defendants cannot complain of the fact that their own words revealed that they had committed that unlawful act with the degree of criminal intent specified in the statute.

■ Also without merit is the contention of Chamberlain and Coyne that the presiding justice erred by not instructing

**1368**

the jury, with regard to manslaughter, that they must find unanimously that each defendant acted with recklessness or with criminal negligence. A jury finding of either culpable mental state supports a conviction of guilt of manslaughter for an unlawful homicide. 17–A. M.R.S.A. §§ 11(3), 203(1)(A). *See State v. Perfetto,* Me., 424 A.2d 1095, 1098 (1981). The jury unanimously found the defendants guilty of manslaughter. The unanimity of the verdict was required for conviction under the Maine Constitution, Article I, section 7. The defendants suffered no prejudice from the fact that the presiding justice did not give the requested instruction.

 We find similarly without merit the defendants' contentions that the evidence adduced at trial was insufficient to support the jury's verdict of guilty. The standard for appellate review of the sufficiency of the evidence to support a jury verdict is a limited one: the conviction must stand unless on the evidence presented no rational trier of fact could find proof of guilt beyond a reasonable doubt. *State v. Perfetto, supra,* 424 A.2d at 1097. There was ample evidence on which a rational trier of fact could have found Chamberlain and Coyne guilty of manslaughter, burglary and robbery, and Bleyl guilty of burglary. Because Bleyl's convictions of manslaughter and robbery must be vacated on other grounds, it is unnecessary to consider the sufficiency of the evidence to convict him of those crimes.

The entry is:

Judgment of conviction of David E. Chamberlain for manslaughter, robbery and burglary affirmed.

Judgment of conviction of Mark V. Coyne for manslaughter, robbery and burglary affirmed.

Judgment of conviction of Richard F. Bleyl for burglary affirmed.

Judgment of conviction of Richard F. Bleyl for manslaughter and robbery vacated. Remanded for further proceedings consistent with the opinion herein.

All concurring.